UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
AT COVINGTON

CIVIL ACTION NO. 12-197-DLB-JGW

BARBARA GUNN                                                                           PLAINTIFF

vs.                              MEMORANDUM OPINION AND ORDER

SENIOR SERVICES OF NORTHERN KENTUCKY                        DEFENDANT

* * * * * * * * * * * * * * * * * * * * *

Defendant Senior Services of Northern Kentucky ("SSNK") moves for summary judgment on Plaintiff Barbara Gunn's ("Gunn") gender discrimination claims, brought pursuant to Title VII of the federal Civil Rights Act and its Kentucky counterpart, KRS § 344.040. SSNK argues that the decision to terminate Gunn was based on a legitimate, nondiscriminatory reason; namely, that Gunn's performance as Executive Director was unsatisfactory. Further, SSNK contends that Gunn is unable to show that its proffered reason was merely a pretext for unlawful discrimination. Based on the foregoing, and pursuant to the *McDonnell Douglas* burden shifting framework, SSNK submits that it is entitled to judgment as a matter of law. The Court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

I.      **Factual and Procedural Background**

SSNK is a non-profit corporation with its principal place of business located in Covington, Kentucky. (Doc. # 40 at 3). Its mission is to enable senior citizens to live

dignified, independent lives, and to prevent premature institutionalization.  (*Id.*)  SSNK's programs provide meals, transportation and wellness services to seniors across the following eight counties in northern Kentucky: Boone, Campbell, Carroll, Gallatin, Grant, Kenton, Owen, and Pendleton.  (*Id.*)  It also operates ten (10) Senior Activity Centers, which offer health screenings, exercise classes and other daily activities.  (*Id.*)  SSNK is governed by a sixteen (16) member, volunteer Board of Directors (the "Board").  (*Id.*)

Gunn is a resident of Ohio.  (Doc. # 1 at 1, ¶ 1).  She was hired as Executive Director at SSNK in September 2000, with a starting salary of $80,000 per year.  (Doc. # 40 at 3).  By January 1, 2007, Gunn's salary had gradually increased to $108,500, due in part to merit-based raises.  (*Id.*)  Throughout her tenure, which ended when she was dismissed in January 2012, Gunn was the highest ranking employee at SSNK and reported directly to the Board.  (Doc. # 46 at 4).

Under Gunn's leadership, SSNK began to incur monthly operating deficits during fiscal year 2007.[1]  (Doc. # 40-2 at 1).  It continued to struggle in 2008, reporting an eleven-month deficit of $185,000 and projecting an annual loss of $200,000.  (Doc. # 40-3 at 1).  SSNK experienced similar results in fiscal years 2009, 2010 and 2011.[2]  In order to fund these deficits, it was required to take distributions from a related entity, Senior

---

[1] SSNK's fiscal year runs from July 1 of the previous calender year through June 30 of the year being reported.  For example, fiscal year 2007 began on July 1, 2006 and ended on June 30, 2007.

[2] The Court was not provided with SSNK's operating results for the twelve-month periods ending in 2009, 2010 or 2011.  However, the information that was provided is sufficient to demonstrate SSNK's dismal financial results.  In 2009, SSNK's deficit through eight months was $93,000.  (Doc. # 54-2 at 1).  In 2010, its deficit through ten months was $125,000.  (Doc. # 54-3 at 2).  And in 2011, its deficit through eleven months was $256,000.  (Doc. # 54-7 at 1).

2

Citizens of Northern Kentucky, Inc. ("SCNK"), which holds an endowment for the benefit of SSNK. (Doc. # 40 at 4; Doc. # 40-5 at 3). To further alleviate budgetary constraints, both Gunn and the VP of Finance agreed to reduce their salaries in November 2010. (Doc. # 43-1 at 99-100).

SSNK's financial struggles have been a constant area of concern for the Board. At numerous Board meetings from 2008 on, all of which Gunn attended, members repeatedly stressed the importance of achieving a balanced budget, despite recent and significant cuts in program funding.[3] The Board also emphasized that the endowment should not be regularly used to fund SSNK, and consistently challenged management to develop a self-sustaining business model going forward.[4]

Board Chairman Melissa Lueke ("Lueke") placed this responsibility on the shoulders of her Executive Director. In an email to the Executive Committee on September 15, 2010, Lueke explained that she had previously "asked [Gunn] to be in a position to have a balanced budget to present at the Board Meeting on 9/22," but that Gunn had failed to do

---

[3] This finding is based on minutes from the Board's regular meetings, as well as joint meetings with the Executive/Finance committees and the SCNK Board. *See* Doc. # 54-1 at 1 (stating on June 26, 2008 that "[i]t is the goal of the SSNK Board and management to react to the cuts and achieve a balanced budget in 2009."); Doc. 54-2 at 1 (noting on March 25, 2009 that "SSNK will strive to end the year within the approved budget."); Doc. 54-3 at 2 (declaring on April 28, 2010 that "SSNK needs to balance the budget next year."); Doc. # 54-10 at 1 (stating on October 26, 2011 that "[e]xpectations are for management to build a sustainable business model so SSNK operates at a surplus, not a deficit.").

[4] This finding is also based on minutes from the Board's regular meetings, as well as joint meetings with the Executive/Finance committees and the SCNK Board. *See* Doc. # 54-1 at 1 (stating on June 26, 2008 that "[a] loss in 2009 is not anticipated to be funded by the endowment."); Doc. # 54-2 at 2 (acknowledging on March 25, 2009 that "[t]he SCNK, Inc. Board does not want to tap the [endowment] regularly."); Doc. 54-3 at 2 (noting on April 28, 2012 that "[t]he agency needs to build a business model that is sustainable."); Doc. # 54-7 at 2 (stating on May 25, 2011 that SSNK "needs to operate as a viable business at a break even point on its own.").

this. (Doc. # 40-4 at 2). Lueke stated that she would meet with Gunn and "set the expectation that [she] have a plan for a balanced budget and an organizational structure that will support the delivery of quality services by 9/30." (*Id.*) Lueke further noted that if "[Gunn] is not in a position to deliver this on 10/1, we, the executive committee, are going to have to start making the decisions for [her]." (*Id.*)

Despite Lueke's directives, little had changed by the end of fiscal year 2011. The urgency of SSNK's financial situation was recognized at a combined meeting of the Finance and Executive committees on May 25, 2011. (Doc. # 54-7). Members noted that SSNK was "in its 4th year of an operating deficit and need[ed] to operate as a viable business at a break even point on its own." (*Id.* at 2). Again, the idea of using the endowment to fund SSNK's operations was discussed, but members cautioned that "foundations should not give funds to organizations without sound finances, and SSNK should be a worthy investment for SCNK." (*Id.*)

In July 2011, Gunn sent Lueke a memorandum entitled "FY 2012 Goals." (Doc. 54-8 at 1). Not surprisingly, the first item on Gunn's list was to "manage a balanced budget." (*Id.*) However, after just one quarter of operations in fiscal year 2012, SSNK had already amassed a deficit of $92,000. (Doc. # 54-10 at 1). As a result, during a meeting in October 2011, the Board reiterated that "[e]xpectations are for management to build a sustainable business model so SSNK operates at a surplus, not a deficit." (*Id.*)

Upon receiving revised financials for 2012, which projected an annual deficit of $164,000, Lueke scheduled to meet with the Executive Committee in November 2011 to discuss the "budget and our leadership." (Doc. # 40-7 at 1) (Doc. # 43-1 at 129). A month

4

later, she called for a second meeting in order to "take formal action to effect a change in SSNK leadership." (Doc. # 40-8 at 1). During a conference call on December 21, 2011, the Executive Committee decided to terminate Gunn's employment, and Lueke arranged to meet with her the following week. (Doc. # 41-1 at 22).

Lueke asked for Gunn's resignation on December 27, 2011, explaining that the Board had lost confidence in her ability to lead the organization. (Doc. # 43-1 at 146). When pressed for specific reasons, Lueke added that Gunn was unable to make decisions without the assistance of Board members or outside consultants, and also noted that she had failed to consolidate SSNK's offices. (*Id.*) Gunn was given a severance agreement and told that she had until January 23, 2012 to sign it; otherwise, the offer would be withdrawn and her employment would be terminated immediately.[5] (*Id.* at 146-47).

On January 23, 2012, Gunn wrote to her staff and certain members of the SSNK and SCNK Boards, stating, "I have been told that my performance has not met the expectations of the Board and that the Board has lost confidence in my ability to lead the organization."[6] (Doc. # 40-10 at 1-2). Gunn explained that she had been offered a severance agreement in exchange for her resignation and confirmed that she would not be accepting it. (*Id.*) The Board called a special meeting the next day and unanimously

---

[5] Originally, Gunn's deadline was January 13th, however she was given extra time in order to finish refinancing her home prior to leaving SSNK. (Doc. # 43-1 at 150).

[6] Gunn's statement that her performance did not meet the Board's expectations is based on a conversation she had with Lueke sometime after the initial meeting on December 27, 2011. According to Gunn's deposition, during their second conservation Lueke stated that the Board was treating her dismissal as a "performance issue." (Doc. # 43-1 at 151-52).

voted to terminate Gunn's employment, effective immediately. (Doc. # 40-11 at 1). Shortly thereafter, Gunn received a letter from the Board confirming its decision. (*Id.*)

After terminating Gunn, the Board named Director of Programs Ken Rechtin ("Rechtin") as Interim Executive Director. (Doc. # 40 at 6). Rechtin immediately assumed Gunn's prior responsibilities, but retained his original salary of $70,000 and continued to fulfill his duties as Director of Programs as well. (*Id.*; Doc. # 42-1 at 7). He informed the Board that he could serve only as a temporary replacement because he intended to pursue other options in the future. (Doc. # 41-1 at 21). Rechtin remained in this dual position until June 2014, and then voluntarily resigned. (Doc. # 40 at 6). On June 16, 2014, SSNK hired Jay Van Winkle as its new, full-time Executive Director. (*Id.*)

Gunn filed a complaint with the Equal Employment Opportunity Commission ("EEOC") on April 3, 2012, claiming that she had performed her duties at SSNK competently, that the decision to terminate her was based on gender, and that she was replaced by a male who was less qualified. (Doc. # 40-13 at 4). The EEOC dismissed Gunn's action on June 28, 2012, explaining that it was unable to conclude from the information provided that SSNK had violated any applicable statutes. (Doc. # 40-14 at 1). Gunn filed the instant action three months later, alleging gender discrimination claims against SSNK under (1) Title VII of the federal Civil Rights Act, 42 U.S.C. § 2000(e) *et seq.*, and (2) the Kentucky Civil Rights Act, KRS § 344.040(1)(a). (Doc. # 1 at 3).

6

## II.    Analysis

### a.    Standard of Review

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  If there is a dispute over facts that might affect the outcome of the case under governing law, then entry of summary judgment is precluded.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party has the ultimate burden of persuading the court that there are no disputed material facts and that he is entitled to judgment as a matter of law.  *Id.*  Once a party files a properly supported motion for summary judgment by either affirmatively negating an essential element of the non-moving party's claim or establishing an affirmative defense, "the adverse party must set forth specific facts showing that there is a genuine issue for trial."  *Id.* at 250.  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]."  *Id.* at 252.

### b.    The Legal Framework for a Gender Discrimination Claim

Title VII of the federal Civil Rights Act prohibits employment discrimination on the basis of sex.  42 U.S.C. § 2000e; *see also Reed v. Cnty. of Casey*, 184 F.3d 597, 598-99 (6th Cir. 1999).  Because the Kentucky Civil Rights Act is "virtually identical" to Title VII, Kentucky courts have "followed federal law in interpreting its anti-discrimination statute." *Mills v. Gibson Greetings, Inc.*, 872 F. Supp. 366, 371 (E.D. Ky. 1994); *see also Brewer v. Gen. Drivers, Warehouseman & Helpers Local Union 89*, 190 F. Supp. 2d 966, 973

(W.D. Ky. 2002).  Therefore, the following analysis of Gunn's Title VII claim will also serve to adjudicate her claim under KRS § 344.040(1)(a).

A plaintiff can establish a claim under Title VII by producing either direct or circumstantial evidence.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (quoting *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997)).  Direct evidence is "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions."  *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 382 (6th Cir. 2002) (internal citation and quotations omitted).  With direct evidence, the fact finder is not required to draw any inferences because "the illegal animus is 'explicitly expressed.'"  *Laws v. HealthSouth N. Kentucky Rehab. Hosp. Ltd. P'ship*, 508 F. App'x 404, 408 (6th Cir. 2012) (quoting *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006)).  In this case, there are no direct allegations of unlawful discrimination, and it is clear from Gunn's filings that her claim is based on circumstantial evidence alone.  (Doc. # 46 at 11-12).

When a plaintiff seeks to prove discrimination based on circumstantial, or indirect evidence, courts apply the burden shifting framework adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007).  Under this framework, the plaintiff must first establish a prima facie case by showing that (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably.  *Vincent*, 514 F.3d at 494 (quoting *Peltier v. United States*, 388 F.3d 984, 987

8

(6th Cir. 2004)). If the plaintiff can make this showing, the burden then shifts to the employer to offer a legitimate, nondiscriminatory reason for its adverse employment decision. *McDonnell Douglas Corp.*, 411 U.S. at 802. Finally, if the employer sets forth such a reason, the plaintiff must show by a preponderance of the evidence that the proffered reason was merely a pretext for unlawful discrimination. *Id.* at 804.

For purposes of summary judgment, SSNK admits that Gunn could establish her prima facie case. (Doc. # 40 at 10). SSNK insists, however, that it had a legitimate and nondiscriminatory reason for terminating Gunn; namely, that she was unable to prevent annual operating deficits for five consecutive years and failed to devise a sustainable business model that did not involve regular distributions from SCNK. (*Id.*) In simpler terms, SSNK asserts that Gunn was fired because her performance as Executive Director was unsatisfactory. (*Id.*) Gunn does not challenge that SSNK has met its burden by providing this explanation. After all, the Sixth Circuit has consistently held that unsatisfactory work performance qualifies as a legitimate, nondiscriminatory reason to terminate an employee. *See Stockman v. Oakcrest Dental Ctr., P.C.,* 480 F.3d 791, 802 (6th Cir. 2007); *MacDonald-Bass v. J.E. Johnson Contracting, Inc.,* 493 F. App'x 718, 725 (6th Cir. 2012). With the onus back on Gunn pursuant to *McDonnell Douglas*, the only issue left for the Court to decide is whether there is a genuine issue of material fact that SSNK's proffered reason was merely a pretext for unlawful discrimination.

### c.  *The Issue of Pretext*

In order to establish pretext, the plaintiff must produce enough evidence such that a jury could reasonably reject the employer's explanation and infer discriminatory intent.

*Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 285 (6th. Cir. 2012).  Ordinarily, this is achieved by showing that the employer's articulated reason (1) had no basis in fact, (2) was not the actual reason, or (3) was insufficient to warrant the adverse employment action.  *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994)  Based on Gunn's arguments, only the second and third methods of demonstrating pretext are applicable to this case.

> 1.   <u>SSNK's proffered reason actually motivated the decision to terminate to Gunn.</u>

Under the second method, the plaintiff's challenge is indirect.  *Id.*  While conceding that the stated motivation is factually true and capable of warranting adverse action, she attempts to prove "that an illegal motivation was *more* likely than that offered by the [employer].  In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it 'more likely than not' that the employer's explanation is a pretext, or coverup."  *Id.*  (emphasis in original).  Gunn submits four arguments based on this method of demonstrating pretext.  None of them are persuasive.

First, Gunn contends that SSNK's repeated operating deficits did not actually motivate her dismissal.  (Doc. # 46 at 15).  She observes that throughout the period in which SSNK incurred these deficits, the Board commended her performance as Executive Director.  This, according to Gunn, raises a genuine issue of material fact as to the credibility of SSNK's proffered motivation.  In support, Gunn notes that she received an evaluation in January 2007 that exceeded expectations, and another in January 2010 which identified "managing the budget" as one of her strengths.  (*Id.* at 15-16).  She also cites three favorable remarks that certain Board members made with respect to her

leadership skills and ability to resolve critical issues.  Finally, Gunn plainly insists that she "was never told that it was a performance expectation of her employment that she eliminate any budget deficit that existed at SSNK from 2007 through 2012." (*Id.* at 16).

As to Gunn's general premise, the Court would not expect a sixteen-member Board of Directors to maintain a completely unanimous opinion of its chief executive officer over any extended period of time.  Moreover, Gunn cites no authority to suggest that sporadic compliments regarding one's work performance serve as pretext for unlawful discrimination, and the Court is confident that none exists.  It is of little consequence, then, that Gunn received some positive feedback during the five-plus years in which she failed to prevent an annual operating deficit.  The Court also emphasizes that the amount of such feedback was remarkably limited, and notes that all of it occurred prior to fiscal year 2011, before the Board and Lueke had effectively given up on Gunn.

Additionally, Gunn's statement that she was never expressly tasked with eliminating SSNK's budget deficits is completely at odds with the evidence of this case.  During multiple Board meetings which Gunn attended, the Board explicitly charged management with preventing any further losses from operations.  *See supra* note 3.  Lueke also told Gunn that it was her responsibility to manage a balanced budget.  (Doc. # 54-4 at 1) (directing Gunn to devise a "balanced budget with realistic revenue figures."); (Doc. 54-6 at 2) (telling Gunn to develop a reorganization plan that would "deliver quality services and a balanced budget.").  Perhaps Gunn simply failed to recognize what her responsibilities were, despite having been told on several occasions.  But that in itself would clearly

establish that she was underperforming in her role as Executive Director, and provide strong evidence that SSNK's motivations were anything but pretextual.[7]

Second, Gunn turns to her inability to devise a sustainable business model – one that did not depend on contributions from SSNK – and challenges whether that actually motivated her dismissal. (Doc. # 46 at 17). Gunn takes the familiar position that she was never "told prior to her termination . . . that she was prohibited from utilizing funds from SCNK in order to achieve a balanced budget." (*Id.* at 18). Again, this argument is flatly contracted by the record evidence. On June 26, 2008, for instance, the Board agreed that "a loan to SSNK [to solve its cash problems] is not the role of the endowment." (Doc. # 54-1 at 1). Similarly, on May 25, 2011, the Board clearly stated that "SCNK, Inc. is not a possible funding source at this time." (Doc. # 54-7 at 2). Gunn was present for both of these meetings. See *supra* note 4 for several additional examples.

In further support of her second argument, Gunn submits that it was not feasible to devise a self-sufficient business model for SSNK, due to a myriad of factors that were beyond her control. (Doc. # 46 at 19-20). The sheer difficulty of this task, Gunn explains, creates a material issue of fact as to whether it was the actual reason for her dismissal.

---

[7] Within in her first argument, Gunn raises two additional points that warrant only brief consideration. First, she notes that the audit of SSNK's June 30, 2011 financial statements resulted in an unqualified opinion. (Doc. # 46 at 16-17). From this, Gunn submits that the "financial health of SSNK was fine" and thus concludes that her termination could not have resulted from SSNK's financial struggles. (*Id.*) However, an unqualified audit opinion means nothing with respect to a company's financial success, or lack thereof. It simply confirms that the financial statements are materially accurate and presented in accordance with Generally Accepted Accounting Principles. Therefore, Gunn's argument based on the 2011 audit results is misguided. Second, she notes evidence of pretext in that her successor, Ken Rechtin, also operated under a budget deficit, but was never terminated. (*Id.* at 17). Gunn raises this point twice in her Response; first here, under the second method of demonstrating pretext, and once again under the third method. (*Id.* at 25-26). Pursuant to *Manzer*, this type of argument is applicable only under the third method. As such, the Court will defer Gunn's argument until the next section of this Order.

(*Id.* at 21).   Yet, of the numerous cases that she cites in support of this proposition, only one was decided in the Sixth Circuit, and that case is completely dissimilar from the matter at hand.[8]   (*Id.* at 21-22).   In the absence of controlling authority, the Court is not inclined to adopt Gunn's reasoning.   It is axiomatic that any organization must learn to support itself financially.   And considering Gunn's position as chief executive officer, it is by no means unusual that this responsibility would fall to her.   It is also not surprising that she would encounter obstacles in trying to fulfill this responsibility.   Therefore, the Court finds it ridiculous to suggest that the Board engaged in unlawful discrimination simply because Gunn was held accountable for failing at this task, difficult though it was.

The Court will make one final observation before addressing Gunn's third argument. With her first and second arguments, Gunn essentially states that SSNK's consistent financial struggles were not the actual reason for her termination.   Leaving aside the various points discussed above, this position simply cannot be reconciled with the sequence of events that led to Gunn's dismissal.   Beginning in 2008, SSNK experienced four consecutive years of annual operating losses.   It was Gunn's responsibility to find a solution, and she acknowledged as much in her goals for fiscal year 2012, listing "manage a balanced budget" as her first priority.   Yet, after just one quarter of operations, SSNK had already compiled a deficit of $92,000.   In November, Lueke received revised projections that showed a total loss for the year of $164,000.   She apprised the Executive Committee

---

[8] Gunn relies on *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 554 (6th Cir. 2002).   In *Ford*, the Sixth Circuit addressed whether the plaintiff could use the doctrine of constructive discharge to satisfy the third and fourth elements of his prima facie case for retaliation.   *Id.*   Gunn does not explain how these matters pertain to the instant case, and the issue of pretext is not discussed anywhere throughout the decision.   Thus, Gunn's reliance on *Ford* is misplaced.

of the dismal financial outlook, and, in the same communication, asked for a meeting to discuss the "budget and our leadership."  Lueke called a second meeting the very next month "to effect a change in SSNK leadership," and Gunn was asked to resign shortly thereafter.  Based on these circumstances, the Court is convinced that SSNK's financial difficulties were indeed the actual motivation for Gunn's dismissal.

Third, Gunn argues that her termination was not consistent with company policy. (Doc. # 46 at 22).  She refers to SSNK policy number 500.01.00, entitled "Disciplinary Procedures," which states that "a progressive disciplinary process is usually implemented to provide employees notice of deficiencies and opportunity to improve."  (Doc. # 54-12 at 1).  This process involves four separate steps: (1) verbal counseling, (2) a written warning, (3) suspension, and (4) termination.  (*Id.*)  According to Gunn, the fact that these steps were not followed in her situation suggests that SSNK's proffered reason was not its actual reason.  (Doc. # 46 at 23-24).  She relies on various Sixth Circuit decisions to bolster her position.  *See, e.g., Felder v. Nortel Networks Corp.*, 187 F. App'x 586, 595 (6th Cir. 2006) ("This Court has held that failure to follow internal procedures can be evidence of pretext."); *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 394 (6th Cir. 2005) ("[A]n employer's failure to follow a policy that is related to termination or demotion can constitute relevant evidence of pretext.").

Unlike *Felder* and *DeBoer*, however, the policy in this case was not applicable to Gunn; rather, it governed only those employees that she oversaw.  As evidence, the Court notes that step four of policy number 500.01.00 requires the Executive Director to review and approve all recommendations for termination.  (Doc. # 54-12 at 1).  It stands to reason that Gunn was not subject to this policy, or else she would have been required to approve

14

her own dismissal.  The "Introduction and Purpose" to SSNK's Personnel Policies provide additional support for this conclusion, stating that the "Executive Director is responsible for the administration, interpretation and coordination of these policies."  (Doc. # 54-13 at 1). Because the policy in question does not apply to Gunn, the Board's actions cannot constitute pretext in the manner in which she suggests.

The Court's decision would not change even if the Board had violated company policy.  At virtually every meeting from 2007 through 2012, the Board expressed concern over SSNK's continuing operating deficits, and emphasized the need for management to develop a sustainable business model.  *See supra* notes 3 and 4.  Although somewhat informal, this method of providing feedback appears to have worked well, considering Gunn identified "manag[ing] a balanced budget" as her primary goal for fiscal year 2012. In light of these circumstances, a reasonable juror could not find pretext simply because the Board failed to utilize the four-step disciplinary process described above, regardless of whether such failure was inconsistent with company policy.  *See White v. Columbus Metro. Hous. Auth.*, 429 F.3d 232, 246 (6th Cir. 2005) ("[A]n employer's failure to follow self-imposed regulations or procedures is generally insufficient to support a finding of pretext.").

Gunn's fourth and final argument is based on the allegation that SSNK's articulated reason changed over time.  (Doc. # 46 at 24-25).  She explains that on December 27, 2011, Lueke asked for her resignation because the Board had lost confidence in her ability to lead the organization.  (Doc. # 46 at 24; Doc. # 43-1 at 146).  The following month, however, she observes that the reason for her dismissal had changed to a "performance issue."  (Doc. # 46 at 25; Doc. # 43-1 at 151-52).  And by the time this lawsuit was filed,

15

Gunn notes that SSNK had shifted its position yet again, citing her failure to prevent operating deficits and her inability to devise a sustainable business model. (Doc. # 46 at 25). To support her argument, Gunn relies on a Sixth Circuit decision which held that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext." *Thurman v. Yellow Freight Sys. Inc.*, 90 F.3d 1160, 1167, *opinion amended on denial of reh'g*, 97 F.3d 833 (6th Cir. 1996).

Although *Thurman* is instructive, it does not favor Gunn's position. There, the employer's initial explanation did not refer to any work-related problems whatsoever. *Id.* Yet, as discovery progressed, the employer began insisting that its decision was motivated by the plaintiff's poor work performance and waning attitude. *Id.* The Sixth Circuit agreed with the trial court that the employer's change in motivation established evidence of pretext. *Id.* The instant case is nothing like *Thurman.* From the time the Board first requested her resignation, through the filing of its Motion, the rationale that SSNK gave for Gunn's termination has always been closely related to her lackluster performance. Simply put, the Court finds no meaningful distinction between the initial explanation that the Board had lost confidence in Gunn's ability to lead the organization, Lueke's subsequent statement that Gunn was being dismissed due to a performance issue, or the reasons provided by SSNK in connection with this lawsuit.[9] Gunn's fourth argument is therefore completely without merit.

---

[9] In specific terms, SSNK's Motion explains that Gunn was fired as a result of her inability to prevent operating deficits and her failure to devise a sustainable business model. In more general terms, it states that she was "terminated based on performance issues." (Doc. # 40 at 10).

2.    *SSNK's proffered reason was sufficient to warrant Gunn's termination.*

In contrast to the second method of demonstrating pretext, the third method is considered a "direct attack on the employer's proffered motivation." *Manzer*, 29 F.3d at 1084. The plaintiff attempts to show that other employees, particularly those who are outside the protected class, were not fired despite having engaged in conduct that is substantially identical to that which caused the plaintiff's termination. *Id.* The focus, then, is on whether the plaintiff and the other employee are similarly situated in "all relevant aspects" of their employment. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998). Under Sixth Circuit law, "'the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" *Id; see also Smith v. Leggett Wire Co.*, 220 F.3d 752, 762 (6th Cir. 2000).

Gunn argues that she and Rechtin are "comparables for purposes of evaluating the adverse employment action taken by SSNK." (Doc. # 46 at 25). She observes that they had the same reporting structure and job duties, and insists that they were held to the same set of expectations. (*Id.*) Because Rechtin also experienced consistent operating deficits during his brief tenure, but was never terminated, Gunn submits that SSNK's treatment of Rechtin establishes pretext under the third method. (*Id.* at 25-26).

Gunn overlooks the obvious differentiating circumstances between Rechtin's employment and her own. She was hired as Executive Director in 2000 with a starting salary of $80,000, which increased over time to as high as $108,500. But when Rechtin

17

took the position in 2012, he retained his previous salary of $70,000, and never once received a raise of any kind.  Thus, for a period of time during Gunn's career, she was making almost $40,000 per year more than Rechtin.  Based on income disparity alone, there is no doubt that the Board would measure their respective performances much differently.  Even more important is the fact that Rechtin was deliberately hired as an *Interim* Executive Director.  SSNK knew that he would leave after a short period, and, in fact, Rechtin only took the position after confirming that he would not serve as a permanent replacement.  While Rechtin was certainly expected to handle the same job duties as his predecessor, including the task of eliminating SSNK's extended period of annual operating deficits, his performance must have been considered in light of his temporary role.  In contrast, Gunn was evaluated against a decade-long track record of leadership, which the Board ultimately found unsuccessful in maintaining SSNK's financial and operational stability.  Based on the significantly different standards that Gunn and Rechtin were measured against, the Court finds that they are not similarly situated for purposes demonstrating pretext.  Thus, Gunn's sole argument under the third method fails.

## III.    Conclusion

Because Gunn is unable to demonstrate pretext, as is her obligation under *McDonnell Douglas*, the Court concludes that SSNK is entitled to judgment as a matter of law.  Accordingly, for the reasons stated herein,

**IT IS ORDERED** as follows:

(1)    Defendant's Motion for Summary Judgment (Doc. # 40) be, and is hereby, **granted in full**; and

(2)     A Judgment shall be entered contemporaneously herewith.

This 10th day of March, 2015.



Signed By:

*David L. Bunning*     $\mathcal{DB}$

**United States District Judge**

G:\DATA\Opinions\Covington\2012\12-197 MOO Granting MSJ.wpd

19